UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM PATTERSON, | ) | CASE NO. 1:18-CV-501 |
| | ) | |
| Petitioner, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| OHIO ADULT PAROLE | ) | |
| AUTHORITY[1], | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| Respondent. | ) | |
| | ) | |
| | ) | |

On February 28, 2018, pro se Petitioner William Patterson ("Petitioner") executed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, which was filed on March 5, 2018 and was corrected on March 27, 2018. ECF Dkt. #s 1, 1-2. In his habeas corpus petition, Petitioner requested the Court to immediately release him from custody or, alternatively, vacate or reverse his sentence or order a new trial. *Id.* at 8. For the following reasons, the undersigned RECOMMENDS that the Court DISMISS Petitioner's § 2241 federal habeas corpus petition in its entirety with prejudice. ECF Dkt. #1-2.

## I.    FACTUAL HISTORY

The Ohio Eighth District Court of Appeals set forth the facts of this case on direct appeal. ECF Dkt. #8-1[2] at 213-28. These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6thCir. 1998), *cert. denie*d, 119 S.Ct. 2403 (1999). As set forth by the Eighth District Court of Appeals, the facts are:

---

[1]The then-current Warden of the Lake Erie Correctional Institution, Brigham Sloan, was named as the original Respondent in the instant petition. However, as of December 11, 2018, Petitioner has been released on a 3-year term of supervision. *See* https://appgateway.drc.ohio.gov/OffenderSearch/Search/Details/A653583. As of the date of this Report and Recommendation, Petitioner is in the custody of the Ohio Adult Parole Authority.

[2] Citations to the State Court Record, ECF Dkt. #8-1, will refer to the .PDF page number rather than to specific exhibits.

1

{¶2} Patterson's conviction arose out of a March 24, 2003 incident in which Pier Pinkney had her purse stolen as she was walking to work. Patterson was indicted by the Cuyahoga County Grand Jury on one count of robbery in violation of R.C. 2911.02, a second-degree felony. The indictment alleged that Patterson "did, in attempting or committing a theft offense, as defined in Section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense upon Pier Pinkney, inflict, attempt to inflict, or threaten to inflict physical harm on Pier Pinkney[.]" Patterson pled not guilty and, on February 11, 2004, a jury trial commenced.

{¶3} During the third day of the trial, one of the state's witnesses, Detective Dale Moran with the Cleveland Police Department, disclosed, in response to an unrelated question by the prosecutor, that Patterson had a prior criminal record. Patterson moved for a mistrial. The state objected. After hearing argument on the issue, the trial court granted Patterson's motion for a mistrial.

{¶4} Patterson filed a motion to dismiss the robbery charge on double jeopardy grounds. Patterson argued that Detective Moran was an experienced police detective who knew that it would be "inappropriate," "prejudicial" and in violation of an order in limine previously entered by the trial court to mention Patterson's criminal history. Patterson claimed that the prosecutor knew the information he was eliciting from the witness, knew that it would be prejudicial and likely to lead the jury to find the defendant guilty of the crime with which he had been charged to disclose that information and that it was designed to goad Patterson into moving for a mistrial. The trial court denied the motion.

{¶5} Patterson filed a motion to dismiss on speedy trial grounds, claiming that Patterson's right to a speedy trial under R.C. 2945.73 had been violated. The trial court denied the motion.

{¶6} A second jury trial commenced on April 20, 2005. The state's witnesses, which included Pinkney, Dennis Nichols, who witnessed the incident, and two police officers — Officer Herman Dotson and Detective Dale Moran with the Cleveland Police Department — provided the following account of the incident and subsequent investigation that led to Patterson's arrest and conviction.

{¶7} Pinkney testified that at approximately 7:40 a.m. on March 24, 2003, she parked her car between a homeless shelter and a bar near East 20th Street and Lakeside Avenue in Cleveland. Pinkney testified that each work day she parked her car somewhere in the area of Lakeside Avenue and East 18th Street and East 20th Street, where street parking was free, and then took the loop bus to the Cleveland Municipal Court where she worked as a bailiff. Pinkney testified that it was a clear day and light outside. She testified that as she began walking down Lakeside Avenue to catch the loop bus, she saw a gentleman standing off to the side of the bar. She testified that, at the time, she "didn't really pay him no attention too much" because she was "just trying to catch [her] loop bus," but glanced at the man for "a quick second."

{¶8} Pinkney testified that before she reached the corner of East 18th Street and Lakeside Avenue, the gentleman she had observed near the bar came up behind her, grabbed her by her hair and said to her, "Don't turn around. I have a gun. Give me your purse." Pinkney testified that she felt the man's knuckle press into her back but that she knew from her training as a bailiff that it was not a gun. She testified that her assailant pulled her hair so hard she swung around to the right, facing him as they were "struggling" with her purse. Pinkney testified that the man had one strap of her purse and that she had the other and that they were both "tugging" at it, arm's length apart. She testified that as they were fighting over the purse, she looked at the man face-to-

2

face for "[m]aybe like a minute" or "half a minute." She testified that her assailant was an African-American male with no facial hair. She testified that he was wearing dark clothing and jeans or dark pants with a hoodie pulled over his head. She further testified that his eyes got big and "bug-like" when she turned around and faced him. Pinkney testified that her assailant "wasn't real, real tall," "[b]etween 5'9[ "] and 6 feet maybe," but was definitely taller than her height of 5'3" or 5'4" tall.

{¶9} Pinkney testified that the purse strap on which she had been tugging broke and that the man ran down Lakeside with her purse toward the bar. She testified that the man cut through a little yard and then ran around the corner. Pinkney testified that she tried to follow him but could not catch up with him. She testified that she had some knee problems at the time but could still run "[a] little." She testified that her assailant ran away "very easily" and she did not recall seeing him limp as he ran.

{¶10} Pinkney testified that after the man fled, she walked back toward her car and saw Nichols sitting in his vehicle. Pinkney testified that she got into Nichols's vehicle and used his cell phone to call her employer to let her employer know what had happened and that Nichols then used his cell phone to call the police.

{¶11} Pinkney testified that two officers responded. She testified that she told the officers what had happened, that they took down her information and that the three of them then drove around the area looking for her purse and assailant. Pinkney testified that she had described her assailant to the officers and told them she thought she could identify him if she saw him again. Pinkney testified that they stopped at the nearby homeless shelter and that she and the police went inside the shelter to look for her assailant but that she did not see him there. After driving around with her for approximately thirty minutes, the officers returned Pinkney to her vehicle.

{¶12} Later that morning, Pinkney returned to the homeless shelter alone to see if she could find the man who stole her purse. She testified that she described the man who had taken her purse to one of the individuals who worked at the shelter and that he provided Pinkney with some information regarding a man named William Patterson who purportedly fit her description. Pinkney then went to two different locations she thought the man might be but was unable to locate him. Pinkney testified that the following day she met with Detective Moran, gave him the name William Patterson that she had received from the worker at the homeless shelter and provided a statement to the police regarding the incident.

{¶13} Pinkney testified that after she gave her statement to Detective Moran, he showed her a photo array consisting of six different photos of potential suspects. She testified that the detective gave her the six photographs all at once and that she then laid them down and viewed each one individually. She testified that after she viewed all the photographs, she picked Patterson out of the photographs as the man who had robbed her. She testified that she "knew it was him" "from his eyes" and the "chance [she had] to look at him for that minute" after she "swung around real fast" when her assailant grabbed her hair. She testified that after she went through the photographs once, she knew Patterson was the person who had robbed her but went through the photographs again, just to make certain it was him. Pinkney testified that she was "sure" it was Patterson who had stolen her purse.

{¶14} Pinkney testified that even though Patterson had facial hair in the photograph she picked out of the photo array, she knew it was him because she "remember[ed] what he looked like." She testified that after she picked out the photograph of Patterson in which he had facial hair, the detective showed her a second photograph of Patterson that "look[ed] more like him, because he didn't have really no facial hair"

and that she again identified Patterson as the person who stole her purse. Pinkney denied that the detectives told her, prior to viewing the photo array, that Patterson was in the group of photographs they would be showing her. Pinkney testified that she had never seen Patterson before the March 24, 2003 incident and did not know the name of the man she had identified before she picked him out of the photo array. Pinkney also identified Patterson in court as the person who had robbed her.

{¶15}  On cross-examination, Patterson's counsel pointed out several purported inconsistencies among Pinkney's current trial testimony, her prior trial testimony and/or the statement she had given police. These inconsistencies included (1) Pinkney's failure to tell police that she had seen Patterson standing near the bar before he had come up behind her, (2) that she had previously testified that she had told police that her assailant did not have a hood over his head when she saw him and that her assailant's head was shaved, (3) that she had previously testified that her assailant was 5'8" or 5'9" and that she was struggling with her purse and facing her assailant for four or "maybe a few seconds" and (4) that she had previously testified that, when handing her the photographs for the photo array, one of the detectives said "something" to her, i.e., that "maybe one of the guys may be there." Pinkney also acknowledged on cross-examination that although she did not need glasses to drive, she did not have 20/20 vision at the time of the incident.

{¶16}  Nichols, who witnessed the incident, also testified. He testified that as he was driving to work west on Lakeside Avenue, he noticed "a lady having an altercation with a gentleman" and that he "witnessed her getting her purse snatched." He testified that the incident occurred in front of a tavern located at the corner of East 20th Street and Lakeside Avenue. He testified that the woman, i.e., Pinkney, was in "direct contact" with her assailant, that she was "pulling" and he was "tugging" at her purse and that the woman was frantically yelling and screaming as she was fighting for her purse. He testified that when Pinkney was fighting with her assailant — at the "brief point when [he] saw them"— they were "facing each other" and that the man ultimately prevailed and ran off "swiftly" with the purse.

{¶17}  Nichols testified that, although he did not know her name at the time, he recognized Pinkney because she had parked in the area and walked in her uniform along the same route "for quite some years." He testified that once the man took her purse, he saw Pinkney run after him, but could not recall in what direction the man ran. Nichols testified that he pulled his truck off to the side of the road and used his phone to call the police. He testified that he then called Pinkney over to let her know that he had seen what had happened and had called the police. Nichols testified that Pinkney waited with him until the police arrived. When the police arrived, they took down their information and he and Pinkney told them what had happened.

{¶18}  Nichols testified that the incident occurred between 7 and 7:30 a.m. and that it was "pretty clear lighting" for that time of day; however, he did not get a good look at Pinkney's assailant other than to observe that he was a black male. He testified that the man "wasn't a fat guy," was wearing jeans and a jacket — "loose-fitting type attire" — and that the man appeared to be about Pinkney's height or a little taller. Nichols testified that Patterson was taller than the person he saw struggling with Pinkney.

{¶19}  Officer Dotson, a police officer with the city of Cleveland for thirteen years, responded to the call relating to the incident. He testified that when he and his partner, Officer Don Williams, arrived on the scene, they interviewed Pinkney, learned that her purse had been "snatched" from her and then toured the area, searching for the suspect and her purse. Officer Dotson testified that Pinkney described her assailant as a black

4

male, wearing dark clothing and a hoodie. Officer Dotson testified that they drove around for approximately 30 minutes with Pinkney, searching the trash cans and dumpsters and looking behind buildings but never located her purse or the suspect. He testified that they drove by the homeless shelter looking for the suspect but did not go inside. Dotson testified that the officers then returned to the police station, completed their report regarding the incident and forwarded a copy to the detective unit.

{¶20} Detective Moran, a police officer with the city of Cleveland for 17 years and a detective for 11 years, testified that he was assigned to the case for follow up after the incident. He testified that when he came into the office the day after the incident, he read the report that had been prepared by the responding officers and contacted Pinkney and scheduled a time to meet with her later that day. Detective Moran testified that prior to meeting with Pinkney, he set up a photo array for her to view based on the information Pinkney had previously provided, including that William Patterson was the name of the suspect. He testified that he used Patterson's name to get a photograph of him and then collected photographs of five other men to include in the photo array. He explained that he prepared a photo array, rather than a live lineup, because he did not have the suspect, Patterson, in custody.

{¶21} Detective Moran testified that when he met with Pinkney, he asked her what had happened and prepared a typewritten "synopsis story" (rather than a "verbatim" account) summarizing what she had told him. He testified that he then handed Pinkney the photo array he had created earlier and told her to let him know if her assailant was one of the men in the photographs. He testified that he used six photographs because that is how he has always done photo arrays and how he was taught to do them. He testified that he did not let Pinkney know which photograph was of Patterson and that Patterson's name was not "written on anything." He testified that Pinkney looked through the photographs and, 15 to 30 seconds later, identified the photograph of Patterson as "the man who did this to me." He testified that sometime after Pinkney "absolutely positively picked out" the photograph of Patterson, he showed her a second photograph of Patterson in which he had no facial hair. Detective Moran testified he showed Pinkney the second photograph because Pinkney had told him that the man who robbed her had no facial hair. Detective Moran testified that after he showed Pinkney the second photograph, she said, "that's how he looks now."

{¶22} After Pinkney identified Patterson in the photo array, Detective Moran secured a warrant for Patterson's arrest. Patterson was arrested on April 6, 2003. Detective Moran testified that he "interviewed" Patterson, i.e., that he spoke with Patterson for four or five minutes, and that Patterson told him that "he didn't do it." Detective Moran testified that Patterson told him that he stays at the homeless shelter "on and off" but was not there that weekend as he had been staying with his mother, Helen Peoples. Detective Moran testified that he told Patterson to have Peoples call him but that she never did. Detective Moran testified that he attempted to call Peoples at the number he was given by Patterson but that that number was disconnected. Detective Moran testified that at the time of his arrest, Patterson was 6 feet tall and weighed 200 pounds. He testified that he had seen Patterson several times and had never seen him limp or use a cane.

{¶23} On cross-examination, Detective Moran admitted that his investigation focused on Patterson once Pinkney gave him Patterson's name. Detective Moran testified that he did not go to the homeless shelter to determine whether Patterson had stayed there the night before the incident but that he sent two other detectives to the shelter to see if they could locate Patterson and that they were unsuccessful. Detective Moran acknowledged that Nichols, the only other eyewitness, was never shown a photo array because Nichols had previously told him that, from the distance he observed the

5

incident, he "could not give a positive ID on the [assailant's] face."

{¶24} The purse was never recovered and no other physical evidence was recovered linking Patterson to the crime.

\*\*\*

{¶26} Five witnesses testified on behalf of the defense — Dr. Solomon Fulero, a psychologist specializing in eyewitness identification and the collection of eyewitness evidence, Terrell Vaughn, an intake tech for the homeless shelter, Dr. Feyisayo Adeyina, a family physician at Care Alliance Health Centers who had treated Patterson for a foot and ankle condition, and two alibi witnesses — Leona Smith, Patterson's sister and Helen Peoples, Patterson's mother.

{¶27} Patterson's eyewitness identification expert, Dr. Fulero, testified about research that has been conducted to determine eyewitness accuracy and the results of that research, i.e., that eyewitnesses are not generally as accurate or reliable with their identifications as lay people think they are. He explained in detail how memory works and the factors that can affect eyewitness reliability. Dr. Fulero also discussed eyewitness evidence collection, including the importance of collecting eyewitness evidence when it is fresh and that it is common for an eyewitness account to change over time as memory fades and new information is acquired. He also testified regarding how photo arrays should be performed to "enhance the likelihood of getting the right person and minimize the likelihood of getting the wrong person." Dr. Fulero explained that, contrary to popular belief, police or others with special training in law enforcement have not been shown to have an advantage in accurately recalling events they have witnessed. He testified that it is not who you are, but the situation in which you find yourself, that is the greater predictor of eyewitness accuracy.

{¶28} Smith, a senior federal investigator with the United States Equal Employment Opportunity Commission and Patterson's sister, was one of two alibi witnesses who testified at trial. She testified that on the date of the incident, Patterson was staying in the upstairs portion of a duplex Smith owned with their mother in Euclid, Ohio. Smith testified that Patterson did not stay at her home every day in 2003, that he was "coming and going," that she had "no tabs on him" and that she did "not always know[] where he [was] living at," but recalled that Patterson had stayed with her mother that weekend. She testified that Patterson arrived at the house sometime on Saturday, March 22, 2003, and that she saw Patterson, their mother and her nephew all watching television together when she said good night to her mother the following evening.

{¶29} Smith testified that she was working from home the morning of March 24, 2003. She testified that between 6:30 a.m. and 7:00 a.m., she heard Patterson talking to her nephew, who lived with their mother upstairs, while he was waiting in the hallway inside the house for the school bus. Smith further testified that between 7:25 a.m. and 7:30 a.m., she heard Patterson talking to her daughter while she was waiting for her school bus. She testified that Patterson was still in the house at 8:30 a.m. because she recalls him knocking on her kitchen door around that time and telling her that he had placed a headset their mother had given Smith to use when doing telephone interviews for work on Smith's dining room table. She testified that she specifically recalls this period of time because she was in the process of planning her husband's 46th birthday party for later that week, i.e., March 26th.

{¶30} Peoples, a retired postal worker and Patterson's mother, was Patterson's second alibi witness. She testified that she and her grandson live in the upstairs portion of the

6

house she shares with Smith and that Patterson also stays with her "off and on." She testified that she recalled Patterson spending the night on her couch on March 23, 2003, because she was getting ready to have her bathroom remodeled. She testified that Patterson came over sometime the previous day and helped her clean up the basement and bathroom in anticipation of the remodel. She testified that she went to bed around 9:00 or 9:30 p.m. on March 23, 2003, and that Patterson was at his brother's house that evening playing chess. Peoples testified that she was already in bed by the time Patterson came home on March 23, [2003], but that she heard him come in. She testified that when she awoke in the middle of the night to use the bathroom, she saw Patterson sleeping on her couch. Peoples testified that he was still there the following morning. She testified that she woke Patterson up around 5:00 a.m. on March 24, 2003, to see if he wanted to use the bathroom before her grandson began getting ready for school.

{¶31} Peoples testified that she heard Patterson talking with her grandson around 6:45 a.m. while her grandson was waiting for the school bus. She testified that when the repairman came around 8:00 a.m. that morning, Patterson was still at her home. On cross-examination, the state pointed out some potential inconsistencies between Peoples's trial testimony and statements she had previously made in an affidavit her son had asked her to prepare to verify his whereabouts as of 7:00 a.m. on March 24, [2003]. These potential inconsistencies included (1) the fact that Peoples had stated in her affidavit that Patterson had gotten up at 6:00 a.m. to help her bathe her grandson and that Patterson had been getting ready to go to Akron for a job and (2) the affidavit made no mention of Patterson waiting for the bus with her grandson or most of the facts she testified to at trial.

{¶32} Terrell Vaughn, the intake tech for the homeless shelter near where the incident occurred, also testified in Patterson's defense. He testified that he had checked the shelter's daily check-in sheets to see whether Patterson had stayed at the homeless shelter on the night of March 23, 2003, and that the shelter had no record of Patterson staying at the shelter that night.

{¶33} Dr. Adeyina was Patterson's final witness. She testified that she saw Patterson in February 2003 for complaints of bilateral foot pain. She testified that when Patterson came in to see her, he was mobile but walking with a cane. She testified that she examined Patterson and determined that Patterson had flat feet and a bone deformity that caused thickening around his ankles and decreased mobility in his ankle joints. Dr. Adeyina testified that she diagnosed Patterson with pes planus and degenerative arthritis, prescribed him ibuprofen for his pain and referred him to a podiatrist because she thought he may need orthotics. Dr. Adeyina testified that, notwithstanding his foot and ankle conditions, Patterson could run, but "it might be limited." As to whether Patterson could "run fast, as an [O]lympic sprinter," Dr. Adeyina testified that she did not think so, but did not know because she had never asked Patterson to run for her.

ECF Dkt. #8-1 at 213-28.

## II.    PROCEDURAL HISTORY

### A.    State Trial Court

On April 25, 2003, the Cuyahoga County Grand Jury indicted Petitioner on one count of

Robbery in violation of Revised Code ("R.C.") 2911.02, alleging that Petitioner had "a dangerous

ordnance on or about his person of[sic] under his control," in Case Number CR-436958. ECF Dkt. #8-1 at 11. Petitioner pleaded not guilty. *Id.* at 12. Upon Petitioner's request, the State filed a Bill of Particulars. *Id.* at 13-14.

On May 30, 2003, the Cuyahoga County Grand Jury indicted Petitioner, in a separate case, on one count of Robbery in violation of Revised Code R.C. 2911.02, alleging that Petitioner did "inflict, attempt to inflict, or threaten to inflict physical harm on Pier Pinkney," in Case Number CR-437813. ECF Dkt. #8-1 at 16. Petitioner pleaded not guilty. *Id.* at 17. Upon Petitioner's request, the State filed a Bill of Particulars. *Id.* at 18-19.

Petitioner subsequently filed several motions, including: a "Double Jeopardy Motion/Twice In"; a "Motion: Dismissal of Indictments"; another "Motion for Dismissal of Indictments"; and a "Motion for Acquittal." ECF Dkt. #8-1 at 20-29. During a motion to suppress hearing held on September 29, 2003, the following exchange occurred:

> THE COURT: ... With regard to the double jeopardy motion twice in, the Court will overrule that objection in that this is a reindicted case. I assume that once this case gets rolling, the State will dismiss 436958; is that correct?
>
> MS. LEWIS-BEVEL: Yes, your Honor.
>
> THE COURT: Okay. We'll be proceeding under 437813 so that will be overruled. With regard to the dismissal of the indictments motion filed on September 22, 2003, the Court will again overrule that motion as well.

ECF Dkt. #8-2 at 3, 7, 11-12.

The trial court granted Petitioner's motion to dismiss Case Number CR-436958 after holding a hearing. ECF Dkt. #8-1 at 30. The trial court granted Petitioner's motion to dismiss in Case Number CR-436958 and proceeded under Case Number CR-437813. *See id.* at 30-31. The case then proceeded to trial. *See* ECF Dkt. #8-2 at 3. Due to Detective Moran's disclosure of Petitioner's prior criminal record, the court granted Petitioner's motion for a mistrial and scheduled a new trial. ECF Dkt. 8-1 at 31-32, 214. Petitioner filed a motion on March 30, 2004 to dismiss on the grounds that jeopardy had attached and retrial was prohibited, which the trial court denied. *Id.* at 32-37.

On February 8, 2005, Petitioner filed a motion to dismiss for lack of speedy trial due to several postponements of the new trial. ECF Dkt. 8-1 at 38-41. The trial court denied Petitioner's motion to dismiss for lack of speedy trial. *Id.* at 42. The case went to trial and, on April 28, 2005,

8

the jury found Petitioner guilty as charged. The court referred Defendant to the county probation department for a pre-sentence investigation and set sentencing for May 31, 2005. *Id.* at 43.

On May 12, 2005, Petitioner's counsel orally moved for judgment notwithstanding the verdict, and the court requested a written motion. ECF Dkt. #8-1 at 44. Thereafter, Petitioner submitted a "Supplemental Motion for Verdict of Acquittal Pursuant to Criminal Rule 29(C)," arguing that not enough evidence supported a guilty verdict. *Id.* at 45-50. The State filed an opposition, and the trial court denied Petitioner's motion for a verdict of acquittal. *Id.* at 51-55.

On June 14, 2005, the trial court issued a capias for failure to complete the rest of the pre-sentence investigation report process. ECF Dkt. #8-1 at 56. Petitioner did not appear for sentencing and had left the state. He was arrested in Arizona and then served a 3-4 year sentence there. He did not return to Ohio until November 2013. *Id.* at 719; ECF Dkt. #8-3 at 145-46. After he returned to Ohio in 2013, Petitioner filed nearly forty pro se motions until he was sentenced on April 29, 2014 to six years imprisonment and 3 years post-release control. ECF Dkt. #8-1 at 91, 715-19. The court also appointed appellate counsel for Petitioner. *Id.* at 91.

**B.    Direct Appeal**

On May 21, 2014, Petitioner, through appellate counsel, filed a direct appeal to the Court of Appeals of Cuyahoga County, Eighth Appellate District. ECF Dkt. #8-1 at 92. In his appellate brief filed on August 22, 2014, Petitioner raised the following assignments of error:

1.    The trial court erred in denying Appellant's motion for acquittal as to the charge when the state failed to present sufficient evidence against Appellant.

2.    Appellant's conviction is against the manifest weight of the evidence.

3.    The trial court erred in violation of the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution which provide rights to confrontation and cross-examination when it did not permit a witness to completely testify about the fallibility of eyewitness identification and render an opinion as applied to Appellant's case.

4.    Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article I, of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution when counsel failed to raise the issue of double jeopardy after the first trial was declared a mistrial due to the fault of the State.

*Id.* at 99-132. The State filed a brief in opposition. *Id.* at 134-56.

On November 7, 2014, Petitioner filed a pro se brief with the following additional assignments of error:

> 5.    The trial court erred in violation of the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution, when the trial court denied Deffendant-Appellants[sic] Motion to Dismiss for Lack of Speedy Trial. (See: Memorandum in support of brief).
>
> 6.    Defendant-Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article I of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution when counsel did not permit witnesses Vanessa Har[r]is, Phillip Patterson and Robert Smith to testify that Defendant-Appellant was at 856 E. 236 St, Euclid, Ohio 44132. All witnesses can be reach[sic] at [(XXX) XXX-XXXX] or [(XXX) XXX-XXXX]. Note: Sworn Affidavits and Lack of Speedy trial information was given to or mailed to Appellants[sic] counsel Thomas A. Rein.

ECF Dkt. #8-1 at 157-63. The State moved to strike Petitioner's pro se brief, which it subsequently amended. *Id.* at 164-71. Petitioner requested the court to grant leave to put his pro se brief on the record. *Id.* at 172-73. The court granted the State's amended motion to strike Petitioner's pro se brief, but it sua sponte allowed Petitioner to file a pro se brief not to exceed ten pages that is compliant with the local and appellate rules. *Id.* at 174. Accordingly, Petitioner's pro se motion to grant leave was denied as moot. *Id.* at 175.

On January 2, 2015, Petitioner filed a pro se brief, raising one additional assignment of error:

> 1.    The trial court erred in in[sic] denying Appellant's Motion to Dismiss for Lack of Speedy Trial violating Appellants[sic] speedy trial rights as guaranteed by the Sixth Amendment of the United States Constitution.

ECF Dkt. 8-1 at 177-81. The State filed a brief in opposition. *Id.* at 182-95. Petitioner subsequently filed four pro se memoranda with additional arguments. The first memorandum was a sworn affidavit of Leona J. Smith. *Id.* at 196-98. In his second, third, and fourth briefs, he alleged ineffective assistance of trial counsel. *Id.* at 199-210. On March 12, 2015, the Ohio Court of Appeals affirmed the judgment of the trial court. *Id.* at 211-61.

### C.    Application for Reopening Appeal Pursuant to Ohio App. R. 26(B)

On April 10, 2015, Petitioner executed a pro se application for reopening pursuant to Ohio Appellate Rule 26(B) under Motion Number 484634. ECF Dkt. #8-1 at 262-71, 283. As grounds

for reopening the appeal, Petitioner claimed that appellate counsel had provided ineffective assistance for not raising the following assignments of error:

1.     Appellant Counsel Thomas Rein, as institution records will show never came to visit Defendant-Appellant, William A. Patterson to talk about the issues that are about to be introduce[d].

2.     Appellate Counsel didn't present that Phillip D. Patterson and Vanessa Harris were instructed by trial attorney for defendant appellant (Almeta A. Johnson) to appear at trial to testify on behalf of Appettanl-Defendant[sic] William A. Patterson. (See: Memorandum in support (A) and (B) attached.

3.     Appellate Counsel didn't present that appellant was indicted twice for the alleged crime and one of the indictments was dismiss[sic]. (See memorandum in support C.)

4.     And also Appellate Counsel didn't present that trial counsel for Appellant did a Photo Line-up and had the allege[sic] victim pick Appellant out at trial nowing[sic] that the allege[sic] victim had seen appellant in the court and [illegible] this was not fair to appellant.

5.     Also Appellate Counsel didn't present that appellant didn't have a witness on his behalf to witness the Photo-line up and this is appellant's guaranteed right. Note: The jury at trial had no knowledge of the errors if so that outcome would have been different.

*Id.* Petitioner then filed three more pro se briefs and raised one additional assignment of error in his third brief, alleging that:

Appellant was denied effective assistance of counsel as guaranteed by the Sixth and Fourteenth amendments to the United States Constitution and Article 1, Section 10 of the Ohio Constitution when Appellant and Trial Counsel did not raise this issue.

*Id.* at 272-82. The issue Petitioner was referring to was as follows:

Pier Pinkey[sic] could not identify her attacker and used his (Appellants) name and personal information to implicate William A. Patterson in this case. (She could go to work and get photographs of appellant from the jail computer).

*Id.* at 281.

On August 14, 2015, the Ohio Court of Appeals denied Petitioner's application for reopening. ECF Dkt. #8-1 at 283-90. On September 10, 2015, Petitioner executed a pro se notice of appeal and an accompanying memorandum in support regarding his application for reopening in the Supreme Court of Ohio, both of which were filed on September 14, 2015. *Id.* at 291-301. Petitioner raised the following propositions of law:

11

1.    Sixth Amendment U.S. Constitution; Section 10, Article 1, Ohio Constitution. Right to Effective Assistance of Counsel.

2.    Fifth and Fourteenth Amendments, U.S. Constitution; Section 10, Article 1 Ohio Constitution. Due Process.

3.    Fifth Amendment, U.S. Constitution; Section 10, Article 1, Ohio Constitution. Double Jeopardy.

4.    Fourth Amendment, U.S. Constitution; Section 14, Article 1, Ohio Constitution. Search and Seizure Warrant.

*Id.* at 300. On December 2, 2015, the Supreme Court of Ohio declined to accept jurisdiction pursuant to S. Ct. Prac. R. 7.08(B)(4). *Id.* at 330.

While his appeal was pending in the Ohio Supreme Court, Petitioner moved the Ohio Court of Appeals to reconsider its denial of his application for reopening his appeal pursuant to App. R. 26(B). ECF Dkt. #8-1 at 331-48. On November 17, 2015, the Court of Appeals denied Petitioner's motion. *Id.* at 349.

**D.    Post-Conviction Relief**

While his direct appeal was pending, Petitioner, pro se, filed motions for expert assistance and for appointment of counsel on October 29, 2014 in the trial court. ECF Dkt. #8-1 at 350-56. The trial court denied both motions. *Id.* at 357-58. In addition, Petitioner filed a petition to vacate or set aside judgment of conviction or sentence due to ineffective assistance of counsel and requesting and evidentiary hearing. *Id.* at 359-63. The trial court denied this motion on November 7, 2014. *Id.* at 364.

Nearly one year later, on October 8, 2015, Petitioner executed a motion for reconsideration for post-conviction relief due to ineffective assistance of counsel, which was filed on October 14, 2015. ECF Dkt. #8-1 at 365-79. He raised the following assignments of error:

1.    Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article I, of The Ohio Constitution and The Sixth and Fourteenth Amendments to the United States Constitution when counsel failed to raise the issue of double jeopardy. Appellant was indicted twice for the same crime (Case No. 436958 and Case No. 437813). Case No. 436958 was dismissed by Judge Joseph D. Russo when motion to dismiss was granted. Then Appellant was prosecuted for Case No. 437813 the same case. This deprived Appellant of a fair trial. Trial counsel's failure to move the trial court to dismiss the charge due to Double Jeopardy grounds amounted to ineffective assistance of counsel. (Indictments, and Dismissed Motion Case No. 436958 are attached).

12

> 2.  Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article 1, of The Ohio Constitution and Sixth and Fourteenth Amendments to The United States Constitution when counsel failed to raise the issue of my United States Constitutional right to the Fourth Amendment being violated when alleged victim Pier Pinkney the bailiff for The Cleveland Municipal Court went without a warrant or oath of affirmation to a shelter for men and got personal information of Appellant to implicate Appellant in this case. Alleged victim Pier Pinkney could not identify her attacker and used Appellant's personal information at her job where she work[sic] as a bailiff of the Cleveland Municipal Court to download photographs of Appellant from the jail computer so that she can memorize the photographs and pick Appellant out of a Photo Line-up.
>
> 3.  Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article 1, of The Ohio Constitution and The Sixth and Fourteenth Amendments to The United States Constitution when counsel failed to raise the issue that the trial was unfair after the jury was unable to reach a verdict then the court gave the Howard charge, the jury had no choice but to take the testimony of the Detective Moran and alleged victim Pier Pinkney the bailiff of the Cleveland Municipal Court. (Law enforcement).
>
> 4.  Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article 1, of The Ohio Constitution and The Sixth and Fourteenth Amendments to the United States Constitution when counsel failed to raise the issue that trial counsel failed to let Vanessa Harris and Phillip D. Patterson testify that Appellant was with them on the morning of March 24, 2003 when the alleged crime happened. The failure of trial counsel to allow this critical evidence violated Appellant's rights under both the Ohio Constitution and U.S. Constitution. (Sworn Affidavits attached).

*Id.* at 366-69. The State responded in opposition. *Id.* at 380-86. On October 22, 2015, the trial court denied Petitioner's motion for reconsideration for post-conviction relief. *Id.* at 387.

Petitioner immediately appealed, pro se, to the Eighth District Court of Appeals. ECF Dkt. #8-1 at 388-400. On February 3, 2016, the Court of Appeals stated the following: "Sua sponte, this appeal is dismissed at appellant's cost for lack of a final appealable order. See R.C. 2505.02. A motion to reconsider the denial of post-conviction relief is a nullity and is not properly before this court." *Id.* at 416.

### E.    First Delayed Direct Appeal to Ohio Supreme Court

On July 14, 2016, Petitioner, pro se, executed a notice of appeal in the Ohio Supreme Court under Case Number 2016-1066, which was filed on July 19, 2016. ECF Dkt. #8-1 at 417-19. He also filed a motion for leave to file a delayed appeal of his direct appeal decision of March 12, 2015

13

with a supporting affidavit. *Id.* at 420-26. On September 14, 2016, the Ohio Supreme Court denied Petitioner's motion and dismissed his case. *Id.* at 478.

> ### F.    First Petition for State Habeas Corpus - Cuyahoga County

On August 16, 2016, Petitioner, pro se, executed a petition for a writ of habeas corpus in Case Number CR-03-437813-ZA in the Cuyahoga County Court of Common Pleas. ECF Dkt. 8-1 at 479-87. Petitioner claimed that he was being unlawfully restrained because his two cases were consolidated during a bond hearing and the entire case was dismissed when one case number was dismissed. *Id.* at 483. The State moved to dismiss his state habeas petition due to lack of jurisdiction because Petitioner was incarcerated in Ashtabula County and not in Cuyahoga County. *Id.* at 493-98. Petitioner filed a response. *Id.* at 499-500. The Cuyahoga County Court of Common Pleas denied Petitioner's petition for writ of habeas corpus. *Id.* at 501.

On October 24, 2016, Petitioner, pro se, appealed to the Ohio Eighth District Court of Appeals, Cuyahoga County. ECF Dkt. #8-1 at 502-04. In a merits brief filed on November 3, 2016, Petitioner raised the following assignments of error:

> 1.    The trial court errored[sic] when Appellant was indicted by the Cuyahoga County Grand Jury (1) count of robbery in violation of R.C. 2911.02.A second-degree felony in two (2) separated[sic] case numbers CR-03-436958-ZA and CR-03-437813-ZA. The two (2) indictments time-stamped April 25th, 2003 and May 30.
>
> 2.    The trial court errored[sic] when it granted Appellants[sic] Motion for Dismissal of Indictments pursuant to R.C. 2937.05 on February 18th, 2004 and proceed with a jury trial after dismissing the case thus, violating The Double Jeopardy Clauses of Fifth Amendment to the United States Constitution and Ohio Constitution Art. 10 protect[sic] a criminal defendant against repeated prosecution for the same offen[se].

*Id.* at 509. The State filed a brief in opposition. *Id.* at 518-28. On May 4, 2017, the Ohio Court of Appeals affirmed the judgment of the trial court. *Id.* at 529-36.

On May 4, 2017, Petitioner executed a pro se notice of appeal with the Ohio Supreme Court under Case Number CA-16-105109, which was filed on June 7, 2017. ECF Dkt. #8-1 at 537-39. Petitioner also filed a memorandum of support of jurisdiction. *Id.* at 540-61. On September 27, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S. Ct. Prac. R. 7.08(B)(4). *Id.* at 562.

### G. Second Delayed Direct Appeal to Ohio Supreme Court

On October 11, 2017, Petitioner, pro se, executed a second notice of appeal in the Ohio Supreme Court under Case Number 2017-1415, which was filed on October 16, 2017. ECF Dkt. #8-1 at 563-65. He also filed a motion for leave to file a delayed appeal of his direct appeal decision of March 12, 2015 with a supporting affidavit. *Id.* at 566-72. On December 6, 2017, the Ohio Supreme Court denied Petitioner's motion and dismissed his case. *Id.* at 624.

### H. Second Petition for State Habeas Corpus - Ashtabula County

On February 10, 2016, Petitioner, pro se, executed a petition for a writ of habeas corpus in Case Number CR-03-437813-ZA in the Ashtabula County Court of Appeals, Eleventh Appellate District, which was filed on March 1, 2016. ECF Dkt. 8-1 at 625-35. Petitioner made the same claims as in his first state habeas corpus petition, which was that he was being unlawfully restrained because his two cases were consolidated during a bond hearing and the entire case was dismissed when one case number was dismissed. *Id.* at 627-28. Respondent moved to dismiss his second state habeas petition, arguing that Petitioner's claims were meritless and not cognizable. *Id.* at 659-70. On May 9, 2016, the Eleventh District Court of Appeals granted Respondent's motion to dismiss and dismissed Petitioner's petition for writ of habeas corpus. *Id.* at 671.

On May 9, 2016, Petitioner, pro se, executed a notice of appeal in the Ohio Supreme Court under Case Number 16-0821, which was filed on May 27, 2016. ECF Dkt. 8-1 at 677-78. On August 2, 2016, the Ohio Supreme Court dismissed his case for failure to prosecute. *Id.* at 685.

On August 2, 2016, Petitioner executed a motion for leave to file delayed memorandum in support of jurisdiction, which was filed on August 8, 2016. ECF Dkt. #8-1 at 686-92. Petitioner explained that his memorandum was delayed because he lacked the skill or knowledge to adequately file an appeal without the assistance of counsel. *Id.* at 687. On October 26, 2016, the Ohio Supreme Court denied his motion. *Id.* at 698.

## III. FEDERAL HABEAS CORPUS PETITION UNDER 28 U.S.C. § 2241

On February 28, 2018, Petitioner, pro se, executed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241,which was filed on March 5, 2018. ECF Dkt. #1. A corrected

petition was added on March 27, 2018 to include a missing page. ECF Dkt. #1-2. In his instant §

2241 petition, Petitioner presented the following four grounds for relief:

1.  The trial Court errored[sic] when Petitioner was indicted by the Cuyahoga County Grand Jury on (1) count of robbery in violation of R.C. § 2911.02 a second-degree felony in two (2) separate case number(s) C.R.-03-436958-ZA and C.R. 03-437813-ZA. The two (2) indictments time-stamped April 25, 2003 and May 30, 2003.

2.  The trial Court errored[sic] when it granted Petitioners[sic] Motion For Dismissal of Indictments pursuant to R.C. 2937.05 on February 18, 2004 and proceed[sic] with a jury trial after dismissing the case thus, violating The Double Jeopardy Clauses of the Fifth Amendment of the U.S. Constitution and Art. 10 of the Ohio Constitution that protects defendants from repeated prosecution for the same offense.

3.  The trial court errored[sic] when it indicted petitioner in two (2) separated[sic] case numbers CR-03-436958 and CR-03-437813 for the same offense.

4.  The trial court errored[sic] when it granted a Motion for Dismissal of Indictments in case CR-03-437813 on February 18, 2004 and pro[sic][.]

ECF Dkt. #1-2 at 6-8. Petitioner requested immediate release from custody or to have his sentence

vacated or reversed or a new trial. *Id.* at 8.

On March 8, 2018, this case was referred to the undersigned pursuant to Local Rule 72.2.

ECF Dkt. #2. On July 10, 2018, Respondent filed an Answer/Return of Writ, asserting that Grounds

One, Three, and Four failed to state a federal constitutional claim and are noncognizable and that

all four grounds are procedurally defaulted. ECF Dkt. #8. Respondent requested that the Court

dismiss Petitioner's § 2241 federal habeas corpus petition. *Id*. On July 13, 2018, Petitioner executed

a Traverse, which was filed on July 18, 2018. ECF Dkt. #9.

## IV.   APPLICABLE LAW

### A.   Relationship Between § 2241 and § 2254 Petitions

28 U.S.C. § 2241, entitled "Power to grant writ," covers federal courts' general authority

over habeas corpus petitions. *See, e.g.*, *Rittenberry v. Morgan*, 468 F.3d 331, 333 (6th Cir. 2006);

*Phillips v. Court of Common Pleas, Hamilton County, Ohio*, 668 F.3d 804, 809 (6th Cir. 2012).

Section 2241 permits a federal court to grant a writ of habeas corpus to a prisoner who is "in

custody" in several circumstances, including, in relevant part, (1) "under or by color of the authority

of the United States or is committed for trial before some court thereof," (2) "for an act done or

omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States," or (3) "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(1)-(3).

By contrast, 28 U.S.C. § 2254 is more narrowly worded and only permits a federal court to grant a writ of habeas corpus to "a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). These two provisions overlap somewhat, and the Sixth Circuit has refused to read section 2254 as being completely independent of section 2241, emphasizing:

> [I]f a habeas petitioner could so easily avoid the strict requirements of AEDPA [by filing under section 2241], nobody would file under section 2254, and the statute would become a nullity. This position is supported by the great weight of federal court decisions, which consistently view "§§ 2241 and 2254 as governing a single post-conviction remedy, with the § 2254 requirements applying to petitions brought by a state prisoner in custody pursuant to the judgment of a State court, giv[ing] meaning to § 2254 without rendering § 2241(c)(3) superfluous."

*Rittenberry v. Morgan*, 468 F.3d 331, 335–36 (6th Cir. 2006) (quoting *Thomas v. Crosby*, 371 F.3d 782, 786 (11th Cir. 2004). Rather, although a petition may be filed under section 2241, a state prisoner challenging the constitutionality of his detention must still comply with the stringent requirements of section 2254. *See Allen v. White*, 185 Fed.Appx. 487, 490 (6th Cir. 2006) ("§ 2254 allows state prisoners to collaterally attack either the imposition *or* the execution of their sentences."). As the Sixth Circuit stated:

> [W]hen a prisoner begins in the district court, § 2254 and all associated statutory requirements apply no matter what statutory label the prisoner has given the case. (Roughly speaking, this makes § 2254 the exclusive vehicle for prisoners in custody pursuant to a state court judgment who wish to challenge anything affecting that custody, because it makes clear that bringing an action under § 2241 will not permit the prisoner to evade the requirements of § 2254.) ....

*Greene v. Tennessee Dep't of Corr.*, 265 F.3d 369, 371 (6th Cir. 2001) (internal citation omitted); *e.g.*, *Rittenberry*, 468 F.3d at 336; *Allah-Bey v. Sloan*, No. 1:14-CV-00199, 2014 WL 2520650, at *2 (N.D. Ohio June 4, 2014).

Whether a petitioner can proceed under section 2241 or 2254 is significant because the requirements of section 2254 are deliberately difficult to meet, whereas section 2241 is "more friendly to a habeas petitioner." *See Rittenberry*, 468 F.3d at 333; *Harrington v. Richter*, 562 U.S.

17

86, 102 (2011); *Phillips*, 668 F.3d at 810. Habeas corpus petitions brought under section 2254 are subject to certain procedural hurdles of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which included habeas corpus reform in certain provisions like section 2254, but not section 2241. AEDPA, Pub. L. 104-132, 110 Stat. 1217. The procedural hurdles of section 2254 include a one-year statute of limitations, a deferential standard of review that is applied to state court adjudications, a limitation on successive petitions, and a certificate of appealability requirement. 28 U.S.C. §§ 2244(d)(1), 2254(d), 2244(b)(2), 2253(c). However, the exhaustion requirement generally is still required in section 2241 actions by state prisoners challenging their custody. *See, e.g.*, *Atkins v. People of State of Mich.*, 644 F.2d 543, 547 (6th Cir. 1981) (finding the exhaustion requirement satisfied when 2241 petitioner "availed himself fully of the state machinery in attempting to have the state commence trial on the charges pending against him"); *Fisher v. Rose*, 757 F.2d 789, 792 (6th Cir.1985) (collecting cases); *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 490-91 (1973).

Because section 2254 applies to state prisoners held "pursuant to the *judgment* of a State court," a pretrial detainee ordinarily pursues habeas relief under section 2241, which does permit the issuance of the writ regardless of whether a judgment has been rendered. 28 U.S.C. § 2254(b)(1) (emphasis added); *Klein v. Leis*, 548 F.3d 425, 431 (6th Cir. 2008); *Fisher v. Rose*, 757 F.2d 789, 792 n.2 (6th Cir.1985); *Delk v. Atkinson*, 665 F.2d 90, 93 (6th Cir.1981); *Atkins v. Michigan*, 644 F.2d 543, 546 n.1 (6th Cir.1981). To clarify, section 2241 is appropriate if the "petitioner is in custody pursuant to something other than a judgment of a state court—such as pre-trial detention, pre-trial bond order, awaiting extradition, or other forms of custody that are possible without a conviction." BRIAN R. MEANS, POSTCONVICTION REMEDIES, § 5:2.STATE PRISONERS—STATUTORY GROUNDS FOR RELIEF (July 2019) (collecting cases from several federal circuits). Section 2241 is also the appropriate avenue for claims challenging the execution or manner in which a *federal* prisoner's sentence is served. *See United States v. Peterman*, 249 F.3d 458, 461 (6th Cir. 2001); *Allen v. White*, 185 Fed.Appx. 487, 490 (6th Cir. 2006). Although not all federal circuits agree, the Sixth Circuit acknowledged that it "has allowed state prisoners to proceed under § 2241, but subject

18

to the restrictions imposed by § 2254." *Allen*, 185 Fed.Appx. at 490 (citing *Greene v. Tenn. Dep't of Corr.*, 265 F.3d 369, 371 (6th Cir.2001).

In the instant case, Petitioner filed his petition under 28 U.S.C. § 2241. ECF Dkt. #1-2 . Since Petitioner is in custody and challenging the validity of his state conviction, the requirements of section 2254 apply. ECF Dkt. #1-2 at 2. The fact that Petitioner is currently released and serving a term of supervision does not mean that he is no longer "in custody." *See DePompei v. Ohio Adult Parole Auth.*, 999 F.2d 138, 140 (6th Cir. 1993); *Jones v. Cunningham*, 371 U.S. 236 (1963); *Sevier v. Turner*, 742 F.2d 262, 268 (6th Cir. 1984) ("Whether a habeas corpus petitioner is in custody for purposes of §§ 2241 and 2254 is determined at the time that the complaint is filed."). Therefore, the undersigned will review this petition in light of the standards imposed by section 2254.

### B. Procedural Barriers to Review

A petitioner must overcome several procedural barriers before a court will review the merits of a petition for a federal writ of habeas corpus. Justice O'Connor noted in *Daniels v. United States*: "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." 532 U.S. 374, 381 (2001) (citing *United States v. Olano*, 507 U.S. 725, 731 (1993)).

#### 1. Statute of Limitations

The AEDPA statute of limitations period for filing a petition for a writ of federal habeas corpus is one year, and it begins to run on the date judgement became final. 28 U.S.C. § 2244(d)(1). The AEDPA statute of limitations is not at issue in this case.

#### 2. Exhaustion of State Remedies

Subject to the statute of limitations, federal habeas corpus relief is only available to persons that are in custody in violation of the United States Constitution, laws or treaties. 28 U.S.C. § 2254(a); *Engle v. Isaac*, 456 U.S. 107 (1982); *Smith v. Phillips*, 455 U.S. 209, 221 (1983). As a general rule, a state prisoner must exhaust all possible state remedies or have no remaining state remedies before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Wilson v. Mitchell*, 498 F.3d 491, 498 (6th Cir. 2007). Exhaustion is required before a state prisoner may bring a habeas corpus

19

petition under either 28 U.S.C. § 2241 or 28 U.S.C. § 2254. *See Collins v. Million*, 121 Fed.Appx. 628, 630-31 (6th Cir. 2005). The petitioner bears the burden of proving exhaustion. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Also, the court of appeals may raise and consider the issue of exhaustion *sua sponte*. *Clinkscale v. Carter*, 375 F.3d 430, 438 (6th Cir. 2004) (citing *Harris v. Rees*, 794 F.2d 1168, 1170 (6th Cir. 1986)). Exhaustion does not require a state court adjudication on the merits of the claim at issue. *Clinkscale*, 375 F.3d at 438 (citing *Smith v. Digmon*, 434 U.S. 332, 333 (1978); *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990)).

The exhaustion requirement is satisfied "once the federal claim has been fairly presented to the state courts," which means "the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Smith v. State of Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006) (citing *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001)); *see O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *Wilson v. Mitchell*, 498 F.3d 491, 498-99 (6th Cir. 2007); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990); *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987). A petitioner will not be allowed to present claims never before presented in the state courts, unless he can show cause to excuse his failure to present the claims in the state courts and actual prejudice to his defense at trial or on appeal, or that he is actually innocent of the crime for which he was convicted. *Coleman v. Thompson*, 501 U.S. 722, 748 (1991) (citing *Engle v. Isaac*, 456 U.S. 107 (1982) and *Murray v. Carrier*, 477 U.S. 478 (1986)).

In addition to full presentation, a claim must also be fairly presented to the state courts as a federal constitutional issue rather than merely as a state law issue. *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). To exhaust a claim, a petitioner must present it to the state courts under the same theory that it is later presented in federal court. *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). For a claim to be "fairly presented," the petitioner must assert both a factual and legal basis for his claim in state court. *Fulcher v. Motley*, 444 F3d 791, 798 (6th Cir. 2006). A petitioner "fairly" presents the substance of his federal constitutional claim to the state courts by: (1) relying upon federal cases that use a

constitutional analysis; (2) relying upon state cases using a federal constitutional analysis; (3) phrasing his claim in terms of constitutional law or in terms sufficiently particular to allege the denial of a specific constitutional right; or (4) alleging facts that are obviously within the mainstream of constitutional law. *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004) (internal citation omitted); *McMeans*, 228 F.3d at 681 (citing *Franklin*, 811 F.2d at 326). Although general allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present" claims that specific constitutional rights were violated, a petitioner is not required to recite "book and verse on the federal constitution." *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (citing *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003); *McMeans*, 228 F.3d at 681 (citing *Petrucelli v. Coombe*, 735 F.2d 684, 688-89 (2d Cir. 1984)).

Originally, the Supreme Court interpreted 28 U.S.C. § 2254 as providing that if a petitioner did not fulfill the total exhaustion requirement, a district court *must* dismiss the habeas petition, even if it contained both unexhausted and exhausted claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 852 (1999) (emphasis added) (citing *Rose v. Lundy*, 455 U.S. 509, 522 (1982)); *cf.* 28 U.S.C. § 2254(b)(2) (stating that "a[n] application for a writ of habeas corpus *may* be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.") (emphasis added). However, the Supreme Court became concerned about petitioners losing their opportunity for federal review when the AEDPA, which was enacted in 1996, included a one-year statute of limitations. *See Rhines v. Weber*, 544 U.S. 269, 274-75 (2005). Citing *Rhines*, the Sixth Circuit laid out the options that a district court may pursue in dealing with a mixed petition that contains unexhausted claims:

> When faced with this predicament in the past, we have vacated the order granting the writ and remanded the case to the district court so that it could do one of four things: (1) dismiss the mixed petition in its entirety, *Rhines*, 544 U.S. at 274, 125 S.Ct. 1528; (2) stay the petition and hold it in abeyance while the petitioner returns to state court to raise his unexhausted claims, *id*. at 275, 125 S.Ct. 1528; (3) permit the petitioner to dismiss the unexhausted claims and proceed with the exhausted claims, *id*. at 278, 125 S.Ct. 1528; or (4) ignore the exhaustion requirement altogether and deny the petition on the merits if none of the petitioner's claims has any merit, 28 U.S.C. § 2254(b)(2).

*Harris v. Lafler*, 553 F.3d 1028, 1031-32 (6th Cir. 2009) (citing *Rockwell v. Yukins*, 217 F.3d 421, 425 (6th Cir. 2000)).

The AEDPA, as amended, provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C.A. § 2254(b)(2). Even assuming a state court remedy is available, the District Court may nevertheless consider a petitioner's unexhausted claim if the claim lacks merit and returning to state court "would amount to a mere futility." *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001); *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

### 3. Procedural Default

The procedural default doctrine serves to bar review of federal claims that a state court has declined to address when a petitioner does not comply with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). In these cases, "the state judgment rests on independent and adequate state procedural grounds." *Coleman v. Thompson*, 501 U.S. 722, 730 (1991). For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis removed)). Absent either cause and prejudice or a finding of actual innocence, a federal court is not required to reach the merits of claims that have been procedurally defaulted in state court by a state prisoner or in federal court by a federal prisoner in a defendant's direct criminal appeal. *See Reed v. Farley*, 512 U.S. 339, 354-55 (1994); *William v. Anderson*, 460 F.3d 789, 805-06 (6th Cir. 2006); *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006); *Harbison v. Bell*, 408 F.3d 823, 830 (6th Cir. 2005). Also, when the last explained state court decision rests upon procedural default as an "alternative ground," a federal district court is not required to reach the merits of a habeas petition. *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991). On the other hand, the Supreme Court has held that federal courts are not always required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be. Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."). The Sixth Circuit has endorsed this view in *Hudson v. Jones* and

22

proceeded to the merits in a habeas corpus proceeding when the question of procedural default presented a complicated question of state law and was unnecessary to the disposition of the case. *Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *accord Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008), *as amended* (July 7, 2008).

In determining whether a state court has addressed the merits of a petitioner's claim, federal courts will apply a presumption that there is no independent and adequate state grounds for a state court decision when the decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." *Coleman*, 501 U.S. at 735 (citing *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)); *see also Harris v. Reed*, 489 U.S. 255, 262-63 (1989) (holding that the "plain statement" rule of *Michigan v. Long* applies to federal habeas review). However, the presumption

> does not apply if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims.

*Coleman*, 501 U.S. at 735 n.1; *see Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) (citing *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir.2006)) ("[A] claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.").

Prior to the Supreme Court's ruling in *Coleman*, the Sixth Circuit Court of Appeals established a four-pronged analysis to determine whether a claim has been procedurally defaulted. *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986). Under the *Maupin* test, a reviewing court must decide:

(1)   whether the petitioner failed to comply with an applicable state procedural rule;

(2)   whether the state courts actually enforced the state procedural sanction;

(3)   whether the state procedural bar is an "adequate and independent" state ground in which the state can foreclose federal review; and

(4)   if the above are met, whether the petitioner has demonstrated "cause" and "prejudice."

23

*Id.* at 138.

Under the first prong of *Maupin*, there must be a firmly established state procedural rule applicable to the petitioner's claim and the petitioner must not have complied with the rule. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (state procedural bar that is not "firmly established and regularly followed" cannot serve to bar federal judicial review); *Franklin v. Anderson*, 434 F.3d 412, 418-20 (6th Cir. 2006). The question of whether a state procedural rule was "firmly established and regularly followed" is determined as of the time at which it was to be applied. *Richey v. Mitchell*, 395 F.3d 660, 680 (6th Cir. 2005), *vacated on other grounds in Bradshaw v. Richey*, 546 U.S. 74 (2005), *remanded to Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007); *Franklin*, 434 F.3d at 420.

Under the second prong, the last-explained state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the prisoner's federal claims. *See Coleman v. Thompson*, 501 U.S. 722, 729-30, 735 (1991); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (if a state court does not expressly rely on a procedural deficiency, then a federal court may conduct habeas review); *Gall v. Parker*, 231 F.3d 265, 310 (6th Cir. 2000) (even if issue is not raised below, where state supreme court clearly addresses the claim, no procedural bar arises) (superseded by statute as stated in *Parker v. Matthews*, 567 U.S. 37 (2012) on different grounds); *Boyle v. Million*, 201 F.3d 711, 716-17 (6th Cir. 2000) (where a state appellate court characterizes its earlier decision as substantive, the earlier decision did not rely on a procedural bar; therefore, the cause and prejudice test does not apply). Although the Sixth Circuit has required express reliance on a procedural bar in the past, *see Baze*, 371 F.3d at 320, it has also assumed such reliance when the decision "fairly appears to rest on state law." *Smith v. Warden, Toledo Corr. Inst.*, No. 17-3220, 2019 WL 2518311, at *11 (6th Cir. June 18, 2019) (citing *Coleman*, 501 U.S. at 740).

Under the third prong, a state judgment invoking the procedural bar must rest on a state law ground that is both independent of the merits of the federal claim and is an adequate basis for the state court's decision. *Wilson v. Mitchell*, 498 F.3d 491, 499 (6th Cir. 2007); *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

24

Under the fourth prong, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus, unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 751. "Cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *Geneva v. Lazaroff*, 77 Fed.Appx. 845, 850 (6th Cir. 2003); *see also Murray v. Carrier*, 477 U.S. 478, 488 (1986) (Demonstrating "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."). If a petitioner fails to show cause for his procedural default, the reviewing court need not address the issue of prejudice. *Smith v. Murray*, 477 U.S. 527 (1986); *Geneva*, 77 Fed.Appx. at 850. A petitioner can also show that a fundamental miscarriage of justice will occur if the Court does not address his procedurally defaulted ground for relief. *Schlup v. Delo*, 513 U.S. 298, 321 (1995); *Coleman*, 501 U.S. at 750. The Supreme Court described the fundamental miscarriage of justice exception as follows:

> To ensure that the fundamental miscarriage of justice exception would remain "rare" and would only be applied in the "extraordinary case," while at the same time ensuring that the exception would extend relief to those who were truly deserving, the Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.

*Schlup*, 513 U.S. at 321. Simply stated, a federal court may review federal claims:

> that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

*Bonnell v. Mitchel,* 301 F.Supp.2d 698, 722 (N.D. Ohio 2004). In addition, the Sixth Circuit recognized Ohio's rule that claims must be raised on direct appeal, if possible, or else res judicata bars their litigation in subsequent proceedings. *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013) (citing *State v. Perry*, 226 N.E.2d 104, 108 (1967)). The above standards apply to the Court's review of Petitioner's claims.

25

## C.     Standard of Review

If Petitioner's claims overcome the procedural barriers of time limitation, exhaustion and procedural default, the AEDPA governs this Court's review of the instant case for the reasons previously discussed and because Petitioner filed his petition well after the Act's effective date of April 26, 1996. *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998); *see* ECF Dkt. #1-2. As previously stated, under Section 2254, a state prisoner is entitled to relief if he is held in custody in violation of the United States Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review for the merits of a petition for the writ of habeas corpus. The AEDPA provides a deferential standard of review as follows:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)     resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (emphasis added). In *Williams v. Taylor*, the Supreme Court clarified the language of 28 U.S.C. §2254(d) and stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct principle to the facts of the prisoner's case.

529 U.S. 362, 412-13 (2000). Furthermore, the Supreme Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ

simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*; *see Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001); *Earhart v. Konteh*, 589 F.3d 337, 343 (6th Cir. 2009).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

A. Decisions of lower federal courts may not be considered.

B. Only the holdings of the Supreme Court, rather than its dicta, may be considered.

C. The state court decision may be overturned only if:

  1. It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;

  2. the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

  3. 'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

  4. the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

D. Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable. That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' 'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

E. Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted); *see Casnave v. Lavigne*, 169 Fed.Appx. 435, 438-39 (6th Cir. 2006).

Finally, a reviewing federal court is bound by the presumption of correctness, under which the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice." *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), *cert. denied*, 469 U.S. 1221

(1985); *see Duffel v. Duttion*, 785 F.2d 131, 133 (6th Cir. 1986). The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e). The presumption of correctness applies to basic, primary, or historical facts, and not to mixed questions of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 107-12 (1995). The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *Id.*; *see McMullan v. Booker*, 761 F.3d 662, 671 (6th Cir. 2014) (citing *Thompson*, 516 U.S. at 111). Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law. *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676, n.4 (6th Cir. 2000). Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## V.  ANALYSIS

The undersigned recommends that the Court find that all four grounds raised in Petitioner's habeas corpus petition are procedurally defaulted. When Petitioner returned to the jurisdiction in 2013 after having absconded, he did not raise a either a double jeopardy claim[3] or a sufficiency of the indictment claim on direct appeal. *See* ECF Dkt. #8-1 at 100, 178. After the Court of Appeals affirmed the trial court's judgment of conviction, Petitioner attempted twice to file delayed direct appeals to the Ohio Supreme Court. *Id.* at 211-60, 420-26, 566-72. Both times, the Ohio Supreme Court denied Petitioner's motions for delayed appeal and dismissed his case. *Id.* at 478, 624. In

---

[3] Petitioner's appellate counsel raised an ineffective assistance of counsel assignment of error based upon trial counsel's failure to raise the issue of double jeopardy after the first trial was declared a mistrial. ECF Dkt. #8-1 at 100. By contrast, Petitioner's instant double jeopardy claims are based upon there having been two separate indictments and case numbers, one of which was dismissed. ECF Dkt. #1-2 at 6-8.

28

addition, Petitioner's 26(B) application to reopen, his petition to vacate or set aside, and both of his state habeas petitions were also all unsuccessful. *See* discussion *supra* Sections II.C, D, F & H.

For procedural default purposes, the "last explained state court judgment" with which the undersigned is concerned is the Eleventh District Court of Appeals May 9, 2016 per curiam opinion, which dismissed Petitioner's second state habeas corpus petition. *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); ECF Dkt. #8-1 at 672-76. That court expressly dismissed Petitioner's state petition for failure to state a claim upon which relief can be granted, pursuant to Ohio Civ. R. 12(B)(6). ECF Dkt. #8-1 at 674, 676. Therefore, the Court of Appeal's opinion "plainly" rested primarily on state law because it did not mention federal law and granted the State's motion to dismiss, which was based on Petitioner's failure to state a claim pursuant to Ohio Civ. R. 12(B)(6). *Coleman v. Thompson*, 501 U.S. 722, 739-40 (1991). *Compare* Ohio Civ. R. 12(B)(6) (permitting a party to assert the defense of "failure to state a claim upon which relief can be granted" in a responsive pleading or by motion) *with* Fed. R. Civ. P 12(b)(6) (same).

In his second state habeas corpus petition, Petitioner claimed that his "right to be free from double jeopardy [was violated] when the [trial court] continued the trial after the consolidation of the cases during the January 7th, 2004 bond hearing and by granting the Petitioner's Motion for Dismissal of Indictments and discharging defendant filed on December 30th, 2003 in which he should have been released on that date according to the journal entry." ECF Dkt. #8-1 at 627. This language is virtually identical to Petitioner's Traverse in the instant petition. ECF Dkt. #9 at 5. Relying on state case law, the Court of Appeals stated that "double-jeopardy claims are not cognizable in habeas corpus," because "a defendant has 'adequate remedies in the ordinary course of the law to raise' claims relating to double jeopardy." ECF Dkt. #8-1 at 674 (citing *Johnson v. Crutchfield*, 140 Ohio St.3d 485, 2014-Ohio-3653, 20 N.E.3d 676, ¶ 6 and *Elersic v. Wilson*, 101 Ohio St.3d 417, 2004-Ohio-1501, 805 N.E.2d 1127, ¶ 3). The court concluded that Petitioner could not contest the issue of double jeopardy through his state habeas petition because he could have done so through his direct appeal. *Id.* Therefore, the court declined to address the merits of

Petitioner's double jeopardy claim. *Id.* These double jeopardy claims, which the Court of Appeals addressed, most closely relate to Grounds Two and Four in the instant petition.

Furthermore, Petitioner's second state habeas (as well as his Traverse in the instant case) both state: "A party detained pursuant to the judgment of a court is entitled to the writ of habeas corpus if the court lacked jurisdiction to enter the judgment." ECF Dkt. #8-1 at 627; ECF Dkt. #9 at 5. The Court of Appeals also addressed subject matter jurisdiction in its opinion. ECF Dkt. #8-1 at 674-76. In relevant part, it stated the following:

> {¶11} Even presuming the facts alleged by Patterson are true, there is no support for a conclusion that the trial court lacked subject matter jurisdiction to convict him of Robbery in CR-03-437813-ZA. There is no legal support provided for a conclusion that the dismissal of a similar charge in a separate case deprives the court of subject matter jurisdiction in another case.
>
> {¶12} "Subject-matter jurisdiction of a court connotes the power to hear and decide a case upon its merits." *Morrison v. Steiner*, 32 Ohio St.2d 86, 290 N.E.2d 841 (1972), paragraph one of the syllabus. "A person is subject to criminal prosecution and punishment in this state if * * * [t]he person commits an offense under the laws of this state, any element of which takes place in this state." R.C. 2901.11(A)(1). Courts of common pleas have original jurisdiction in felony cases, invoked by a proper indictment. R.C. 2931.03; *Click v. Eckle*, 174 Ohio St. 88, 89, 186 N.E.2d 731 (1962).
>
> {¶13} There is no question that Patterson was indicted for Robbery, providing the trial court with jurisdiction. To the extent that Patterson challenges the validity of the indictment under which he was ultimately convicted, this cannot be raised in habeas corpus proceedings. "[H]abeas corpus is not available to challenge either the validity or sufficiency of an indictment" since these issues can be raised in a direct appeal. *Smith v. Seidner*, 78 Ohio St.3d 172, 173, 677 N.E.2d 336 (1997). Further, the charge under this indictment and for which Patterson was convicted was not dismissed at any time. The fact that the bonds were consolidated does not mean that dismissal of one case results in dismissal of the other and Patterson provides no legal justification for this assertion.

ECF Dkt. #8-1 at 675-76. These sufficiency of the indictment claims, which the Court of Appeals addressed, most closely relate to Grounds One and Three in the instant petition.

The Court of Appeals addressed all four grounds of relief that are presently before the undersigned and relied on state procedural law to dismiss his second state habeas petition. As such, the first three prongs of the *Maupin* test are satisfied. *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986). Petitioner has neither argued for nor demonstrated either "cause" or "prejudice," the fourth prong of *Maupin*. *Id.* The "last reasoned state-court judgment decline[d] to reach the merits because

of [Petitioner's] failure to comply with a state procedural rule," namely, stating a claim upon which relief can be granted. *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013); *see* ECF Dkt. #8-1 at 672-76. Accordingly, the undersigned recommends that the Court find that Petitioner has procedurally defaulted all four of his claims.

**VI.      CONCLUSION AND RECOMMENDATION**

For the above reasons, the undersigned RECOMMENDS that the Court DISMISS Petitioner's § 2241 federal habeas corpus petition (ECF Dkt. #1-2) in its entirety WITH PREJUDICE.


DATE: November 8, 2019                          */s/ George J. Limbert*
                                                 GEORGE J. LIMBERT
                                                 UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).